# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

№ 16-CV-6101 (CBA) (RER)

---

UNITED STATES,

Plaintiff,

VERSUS

REAL PROPERTY LOCATED AT 120 TERIWOOD STREET, FERN PARK, FLORIDA 32730; REAL PROPERTY LOCATED AT 115 EASTWIND LANE, FERN PARK, FLORIDA 32730; AND REAL PROPERTY LOCATED AT 163 FALL WOOD STREET, FERN PARK, FLORIDA 32730,

Defendants *In Rem*.

---

**Report & Recommendation**
May 18, 2020

---

TO THE HONORABLE CAROL BAGLEY AMON
SENIOR UNITED STATES DISTRICT JUDGE

**RAMON E. REYES, JR., U.S.M.J.:**

The United States of America (the "Government") brought this *in rem* civil forfeiture action under 18 U.S.C. §§ 981(a)(1)(A) and (C) against three parcels of real property located in Fern Park, Florida. (Dkt. No. 1 ("Compl.")). Claimants to one of the three properties appeared and entered into a Stipulation of Settlement with the Government that was approved by the Court. (Dkt.

1

No. 31). No other claims or answers were filed and the Clerk of the Court entered default against the properties.[1] (Dkt. No. 15). The Government subsequently filed this Motion for Partial Default Judgment against the two remaining properties only. (Dkt. No. 32). Your Honor referred this motion to me for a Report and Recommendation. (Order dated 10/23/2019). For the reasons discussed below, I respectfully recommend the Government's Motion for Partial Default Judgment be granted.

## BACKGROUND[2]

The Government brings this *in rem* civil forfeiture action against three properties: (1) 120 Teriwood Street, Fern Park, Florida 32730 (the "Teriwood Property"); (2) 115 Eastwind Lane, Fern Park, Florida 32730 (the "Eastwind Property"); and (3) 163 Fallwood Street, Fern Park, Florida 32730 (the "Fallwood Property"). (Compl. ¶ 1). However, this Motion for Partial Default Judgment seeks default judgment against only two of the properties: the Eastwind Property and the Teriwood Property (collectively, the "Properties"). (Dkt. No. 32).[3]

The Government alleges the Properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) as proceeds "traceable to" the trafficking of contraband cigarettes in violation of the Contraband Cigarette Trafficking Act ("CCTA"), 18 U.S.C. § 2341 *et seq*. (Compl. ¶ 2). In

---

[1] The Lake of Woods Homeowners Association, Inc. filed a letter with this Court regarding a prospective claim. (Dkt. No. 7). This claim, based on delinquent association dues, is unrelated to the default by the Properties and their owners and as such is not considered here.

[2] Unless otherwise indicated, the following factual allegations are taken as true. *See Bricklayers Ins. & Welfare Fund v. R. Smith Restoration*, No. 11-CV-3854 (FB) (RER), 2013 WL 2120306, at *2 (E.D.N.Y. Mar. 8, 2013).

[3] In addition to forfeiture of the Properties, the Government seeks "costs and disbursements." (Compl. at 20). However, the Government does not provide documentation or describe the type or amount of such costs and disbursements, as is required in a default judgment case. *Xin Long Lin v. New Fresca Tortillas, Inc.*, No. 18-CV-3246 (RJD) (RER), 2019 WL 3716199, at *2 (E.D.N.Y. May 1, 2019) (citing *Cement and Concrete Workers Dist. Council Welfare Fund v. Metro Foundation Contractors, Inc.*, 699 F.3d 230, 235 (2d Cir. 2012) (In a default judgment, after a finding of liability, "[i]t is the court's responsibility to establish that damages have an evidentiary basis that can be ascertained with 'reasonable certainty.'").

addition, the Government alleges the Properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), because the Properties were "involved in" money laundering in violation of 18. U.S.C. §§ 1956 and 1957. (*Id.*).

The underlying violations stem from alleged contraband cigarette trafficking by Michael Zekry ("Zekry"). The Complaint alleges that in order to circumvent New York law imposing a sales tax on cigarettes sold in the state, Zekry purchased large quantities of cigarettes in Virginia, brought them back to Staten Island, and sold them. (Compl. ¶ 17). Between 2005 and 2015, the Government alleges Zekry was convicted four different times in New York under N.Y. Tax Law § 1814 for "possession of untaxed and/or unstamped cigarettes." (*Id.* ¶ 18). In 2016, Zekry was charged with possession, transport, or sale of 30,000 or more unstamped or unlawfully stamped cigarettes, in violation of N.Y. Tax Law § 1814. (*Id.* ¶ 26).

During a 2014 investigation, law enforcement officers received search and seizure warrants for several bank accounts allegedly used by Zekry, including one held by his son, Jonathan Zekry, (the "Jonathan 2100 Account"), and one held by his son's girlfriend, Daniella Matatov, (the "Matatov 9453 Account"). (Compl. ¶¶ 22–23; 27). The Government alleges Zekry used both the Jonathan 2100 Account and the Matatov 9453 Account "to store and launder illegal proceeds generated from Zekry's sale of contraband cigarettes." (*Id.* ¶ 27). Those "illegal proceeds were then used to purchase the Defendants *in rem*." (*Id.*).[4]

The Government supports these allegations with descriptions of the two accounts that reflect "a similar pattern of regular deposits of cash and checks, on a weekly or biweekly basis" issued by "various individuals with Staten Island addresses," believed to be "Zekry's cigarette

---

[4] While the Government alleges several times throughout the Complaint that both the Jonathan 2100 Account and the Matatov 9453 Account were used to purchase the Defendants *in rem*, the only property that was not purchased with the Jonathan 2100 Account is the Teriwood Property, which the Government alleges was purchased with a different account, presumably held in Matatov's name, referred to as the "Matatov 4937 Account." (Compl. ¶¶ 30–33).

3

customers." (Compl. ¶ 28). All checks were made out to "Cash" and some "had 'cigarettes,' 'cigs,' or 'Mike' written on the reference line." (*Id.*). In addition, throughout 2013 and 2014, the two accounts were used to pay Gaby Nouhra, "the president of Discount Tobacco & Things in Virginia, where Zekry purchased cigarettes." (*Id.* ¶ 30).

In August 2012, the Jonathan 2100 Account was used to purchase the Eastwind Property and granted to Zekry. (Compl. ¶ 32). Leading up to the purchase of the Eastwind Property, the Government describes "regular cash deposits and customer check deposits into the account" and that "these illegal proceeds were used to purchase" the Eastwind Property. (*Id.*).

In September 2013, the Teriwood Property was purchased and granted to Matatov. (Compl. ¶ 31). The account used to purchase the Teriwood Property is in question. In most of the Complaint, the Government indirectly alleges the Teriwood Property was purchased using the Matatov 9453 Account. (*See, e.g.*, *id.* ¶¶ 27, 30). However, when providing specific details, the Government alleges a different "Matatov" bank account, referred to as the "Matatov 4937 Account," was used to purchase the Teriwood Property. (*Id.* ¶ 31); *see also supra* note 4. The Government alleges that "for the first half of 2012, there was little activity in the [Matatov 4937] account except for biweekly deposits of $132, and the account balance never exceed $500." (*Id.*). However, "in or about August 2012, there were approximately 29 customer checks deposited into the account," a pattern that the Government alleges "continued on a monthly basis." (*Id.*). And it was "these illegal proceeds [that] were used to purchase" the Teriwood Property in September 2013. (*Id.*).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 55, "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the Clerk [of the Court] must enter the party's default." Fed. R. Civ. P.

4

55(a). Once the Clerk of the Court has entered default, the moving party then "must apply to the court for default judgment" Fed. R. Civ. P. 55(b)(2).

When a default is entered a court is required to accept as true all well-plead factual allegations and draw all reasonable inferences in the moving party's favor. *E.g., Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009); *McFarlane v. Harry's Nurses Registry*, No. 17-CV-06350 (PKC) (PK), 2020 WL 1643781, at *16 (E.D.N.Y. Apr. 2, 2020). Nevertheless, "the Court still has the 'responsibility to ensure that the factual allegations, accepted as true, provide a proper basis for liability and relief.'" *United States v. Approx. $447,420.00 in U.S. Currency*, No. 19-CV-3528 (AMD) (LB), 2020 WL 821904, at *3 (E.D.N.Y. Feb. 3, 2020) (quoting *Rolls-Royce PLC v. Rolls-Royce USA, Inc.*, 688 F. Supp. 2d 150, 153 (E.D.N.Y. 2010)).

Along with the standard Federal Rule of Civil Procedure 8 ("Rule 8") pleading, civil forfeiture actions have additional specific pleading requirements. Rule G of the Supplemental Rules for Certain Admiralty and Maritime Claims and Asset Forfeiture Actions ("Rule G") requires the complaint "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Rule G(2)(f). "Accordingly, the Government's complaint must "'assert specific facts supporting an inference that the property is subject to forfeiture.'" *United States v. Any & all Funds on Deposit in Account Number 0139874788, at Regions Bank, held in the name of Efans Trading Corp.*, No. 13 Civ. 7983 (KPF), 2015 WL 247391, at *5 (S.D.N.Y. Jan. 20, 2015) (quoting *United States v. $22,173.00 in U.S. Currency*, 716 F. Supp. 2d 245, 248 (S.D.N.Y. 2010)).

In addition, Rule E of the Supplemental Rule for Certain Admiralty and Maritime Claims and Asset Forfeiture Actions ("Rule E") requires the complaint "state the circumstances from

5

which the claim arises with such particularity that the defendant or claimant will be able . . . to commence an investigation of the facts and to frame a responsive pleading." Rule E(2)(a).

## DISCUSSION

### I. Procedural Requirements

To succeed in a civil *in rem* forfeiture action against real property, the Government must comply with the procedural requirements in Rule G and 18 U.S.C. § 985. Here, the Government has complied with the Rule G requirements. First, the Government's Complaint is verified. (Compl. at 21); Rule G(2)(a). Second, the Government published notice of the civil forfeiture against the Properties with all required information and particularity to a government forfeiture website for thirty consecutive days. (Dkt. No. 3); Rule G(4)(a). Third, the Government provided direct notice to all known potential claimants to the Properties. (Dkt. No. 6-2 ¶ 5); Rule G(4)(b).

The Government has also complied with the requirements of 18 U.S.C. § 985. First, the Government posted notice of the complaint on the Properties. (Dkt. No. 6-2 ¶ 4); 18 U.S.C. § 985(c)(1)(B). Second, the Government personally served each property owner with copies of the notice and Complaint. (Dkt. No. 14-1 at 8–10); 18 U.S.C. § 985(c)(1)(C); Fed. R. Civ. P. 4(e).

### II. Sufficiency of the Complaint

The Government puts forth two theories of forfeitability: First, that the Properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) as proceeds "traceable to" the trafficking of contraband cigarettes in violation of the CCTA (Compl. ¶¶ 35, 41); and Second, that the Properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because they were "'involved in' financial transaction[s], in violation of 18 U.S.C. §§ 1956 and 1957, involving the proceeds of specified unlawful activity" (Compl. ¶¶ 38, 44).

### A. Forfeitability of the Properties Pursuant to 18 U.S.C. § 981(a)(1)(C)

The Government's first theory of forfeitability is that the Properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). (Compl. ¶¶ 35, 41). Under 18 U.S.C. 981(a)(1)(C), the Government must plead that the allegedly forfeitable property "constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined by section 1956(c)(7) of this title)." *See* 18 U.S.C. 981(a)(1)(C). Here, the Government alleges that Zekry violated the CCTA, an offense constituting "specified unlawful activity" under 18 U.S.C. § 1956(c)(7).[5]

To sufficiently plead the Properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), the Government must allege that the Properties (1) constitute or are derived from proceeds (2) traceable to (3) Zekry's CCTA violation. *See In re 650 Fifth Avenue*, 830 F.3d 66, 88 (2d Cir. 2016).

1. <u>CCTA Violation</u>

As an initial matter, the Government must properly allege that Zekry trafficked contraband cigarettes in violation of the CCTA. *See In re 650 Fifth Avenue and Related Properties*, 830 F.3d at 88–89 (finding the underlying forfeitable offense is an element of civil forfeiture under 18 U.S.C. § 981(a)(1)(C)).

To adequately plead a CCTA violation, the Government must allege the "four elements of a CCTA violation: that a party (1) knowingly 'ship, transport, receive, possess, sell, distribute or purchase' (2) more than 10,000 cigarettes (3) that do not bear tax stamps, (4) under circumstances where state or local cigarette tax law requires the cigarettes to bear such stamps." *City of New York*

---

[5] "[T]he term 'specified unlawful activity' means any act or activity constituting an offense listed in section 1961(1) of this title." 18 U.S.C. § 1956. "Racketeering activity" is listed as an offense in section 1961(1) and includes violations of 18 U.S.C. § 2342 "relating to trafficking in contraband cigarettes." 18 U.S.C. § 1961(1)(B).

7

*v. Golden Feather Smoke Shop, Inc.*, No. 08-CV-3966 (CBA), 2009 WL 2612345, at *26 (E.D.N.Y. Aug. 25, 2009); *see also City of New York v. Fedex Ground Package System, Inc.*, 351 F. Supp. 3d 456, 473 (S.D.N.Y. 2018) (stating the same).

The Government sufficiently alleges that Zekry violated the CCTA. First, Zekry knowingly transported, possessed, and/or sold cigarettes by purchasing cartons of cigarettes in Virginia and transporting them back to New York where he sold them to New York customers. (Compl. ¶¶ 18, 21). Second, the cigarettes that he transported, possessed, and/or sold were in excess of 10,000. (*Id.* ¶¶ 21–22, 26). Third, the cigarettes did not bear New York tax stamps.[6] (*Id.*). Fourth, New York State requires that each pack of cigarettes bear a New York tax stamp. (Compl. ¶¶ 6–7,16); N.Y. TAX LAW § 471(2) (McKinney 2019). Therefore, the Government sufficiently alleges that Zekry violated the CCTA, fulfilling the third element of a forfeitability claim under 18 U.S.C. § 981(a)(1)(C).

2. "Proceeds"

The term "proceeds" as used in 18 U.S.C. § 981(a)(1)(C), has two potential definitions:

(A) In cases involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes, the term "proceeds" means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense.

(B) In cases involving lawful goods or lawful services that are sold or provided in an illegal manner, the term "proceeds" means the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services. The claimant shall have the burden of proof with respect to the issue of direct costs. The direct costs shall not include any part of the overhead expenses of the entity providing the goods or services, or any part of the income taxes paid by the entity.

---

[6] While the cigarettes were affixed with the tax stamps of other States, the New York stamp—that is, "the tax stamp of the jurisdiction in which the cigarettes are found"— is the stamp needed to comply with the law and avoid a violation of the CCTA. *City of New York v. Milhelm Attea & Bros., Inc.*, No. 06-CV-3620 (CBA), 2012 WL 3579568, at *31 (E.D.N.Y. Aug. 17, 2012).

18 U.S.C. § 981(a)(2)(A)–(B). Thus, the definition of the term "proceeds" depends on whether the case involves (1) "illegal goods" and/or "unlawful activities" or (2) "lawful goods . . . that are sold or provided in an illegal manner." *Id.*

However, "[t]he case law interpreting these provisions is sparse. In the precedent that does exist, courts have interpreted [section] 981(a)(2)(A) as applying to conduct that is 'inherently unlawful,' meaning conduct that cannot be committed in a lawful manner, such as robbery." *United States v. Percoco*, No. 16-CR-776 (VEC), 2019 WL 1593882, at *3 (S.D.N.Y. Apr. 15, 2019) (collecting cases). "In contrast, courts have interpreted [section] 981(a)(2)(B) as applying to the sale of 'a good or service that could, hypothetically, be provided in a lawful manner' but that, in the context of the case, was provided illegally, such as trading securities based on material nonpublic information." *Id.* (collecting cases).

In the case of CCTA violations, courts have considered applying both definitions. Using the trend described in *Percoco*, one could reason that selling cigarettes in violation of the CCTA is not "inherently unlawful" because selling cigarettes can be done in a lawful manner. Moreover, cigarettes, generally, are considered lawful goods but in the case of a CCTA violation, are being sold in an illegal manner (i.e., without the appropriate tax stamps). In *United States v. Morrison*, the court, in dicta, came to this same conclusion. 656 F. Supp. 2d 338, 349 (E.D.N.Y. 2009). In that case, the court noted that while the question of which definition should be used in a CCTA case was "not free from doubt, such Second Circuit authority as there is suggests that" the second definition, allowing for the deduction of direct costs, would be appropriate and the court was prepared to take this course of action. *Id.* (citing *United States v. Lizza Industries, Inc.*, 775 F.2d 492, 497–99 (2d Cir. 1985)).

9

In comparison, the district court in *United States v. Funds From First Regional Bank Account No. XXXXX1859 Held in the Name of R K Company, Inc.* found that when dealing with a CCTA violation, the first definition should apply because the trafficking and sale of unstamped cigarettes constitutes both unlawful activity and the sale of illegal goods. 639 F. Supp. 2d 1203, 1216 (W.D. Wash. 2009). The court came to this conclusion because "[t]he explicit language of the CCTA specifies that trafficking in contraband cigarettes is considered unlawful activity." *Id.* The court further reasoned that trafficking and selling contraband cigarettes under the CCTA amounts to the sale of "illegal goods" because, *inter alia*, the "the term 'contraband' is generally defined as 'goods that are *unlawful* to import, export, or possess.'" *Id.* (quoting BLACK'S LAW DICTIONARY 341 8th ed.) (emphasis in the original).

Here, the Government has not expressly indicated which definition of proceeds it is using in its argument. However, it is unnecessary for the Court to determine which definition applies for two reasons. First, the burden of proof to show the "direct costs" to be deducted from otherwise forfeitable proceeds rests with the claimant. 18 U.S.C. § 981(a)(2)(B); *see also Percoco*, 2019 WL 1593882, at *6 ("Defendant has the burden of proving that such a deduction should apply.") (citing *United States v. Mandell*, 752 F.3d 544, 553–54 (2d Cir. 2014)). If the claimant fails to meet this burden, the Government is entitled to the full amount of proceeds generated. *Percoco*, 2019 WL 1593882, at *7 ("Because Defendant has failed to sustain his burden of proving direct costs, no offset would be appropriate even if [section] 981(a)(2)(B) applies to this case."); *Morrison*, 656 F. Supp. 2d at 351 (denying claimant's "requested deduction against gross CCTA sales" for failure to meet his burden, after noting the court was prepared to find section 981(a)(2)(B) applied); *see also United States v. Sum of $70,990,605,* 4 F. Supp. 3d 189, 208 (D.D.C. 2014) ("If the claimant fails to prove direct costs, the government can forfeit the entire amount claimed here.") (collecting

10

cases). Because no claimants have appeared, there are no claimants to show the direct costs that would be deducted. Therefore, the Government is entitled to the full amount of the proceeds. *See United States v. All Assets Listed in Attachment A*, No. 14-CV-969, 2015 WL 1401747, at *3 n.5 (E.D. Va. Mar. 25, 2015).

Second, it is reasonable to infer that the proceeds used to purchase the Properties already represent the proceeds of the unstamped cigarette sales less the direct costs incurred in providing the cigarettes. The Government alleges that both accounts were used to purchase out-of-state cigarettes (Compl. ¶ 30). Moreover, the Government does not allege any facts that indicate either of the accounts contained funds other than those from Zekry's customers.[7] Therefore, it is reasonable to infer that both accounts contained only Zekry's net proceeds from his sale of unstamped cigarettes.

In either event, it is enough that proceeds are understood to mean funds generated from the CCTA violation. 18 U.S.C. § 981(a)(2)(A) (Proceeds are "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture."); 18 U.S.C. § 981(a)(2)(B) (Proceeds are" the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services."). Therefore, funds can become "proceeds" when all elements of a CCTA violation are met. *Id.* In a typical CCTA case, the elements are met when the 10,001st unstamped cigarette is trafficked. *See FedEx Ground Package System, Inc.*, 351 F. Supp. 3d at 477 (S.D.N.Y. 2018). Here, the Eastwind Property was purchased in August 2012 and the Teriwood Property was purchased in September 2013. (Compl. ¶¶ 31–32). Based on the Government's allegations, it is reasonable to infer that

---

[7] The Government does allege that the Matatov 4937 Account received biweekly deposits of $132 for the first half of 2012. (Compl. ¶ 31). It is unclear whether those deposits continued after the first half of 2012. Even if they did, the sum of those biweekly deposits over the relevant time period would amount to less than the balance left in the Matatov 4937 Account after the purchase of the Teriwood Property. *See infra* note 9.

11

Zekry had sold more than 10,000 unstamped cigarettes by August 2012, making both Properties forfeitable if purchased with proceeds of Zekry's sale of unstamped cigarettes.

In October 2012, the Government alleges that Zekry "told law enforcement officers, in sum and substance, 'I go once a month to Virginia stores to purchase cigarettes and sell them to 30 or more customers in New York.'" (Compl. ¶ 18). Based on the Government's allegations about Zekry's selling patterns, it is reasonable to infer that Zekry almost exclusively sold cigarettes by the carton or more, as opposed to individual cigarettes or packs of cigarettes. (*Id.* ¶¶ 19, 21, 28). A carton of cigarettes typically contains 200 cigarettes. (*Id.* ¶ 19). Therefore, it is reasonable to infer that if Zekry was selling cartons of cigarettes to 30 or more customers per month prior to October 2012, he had exceeded the $10,001^{st}$-mark by that time. Even if Zekry sold only one carton to each of his thirty customers, he would have sold 6,000 cigarettes per month. Therefore, Zekry would have surpassed the $10,001^{st}$-mark within two months. Moreover, it is reasonable to infer from Zekry's New York state convictions in 2005 and 2006 for unlawful possession, transport, or sale of unstamped cigarettes and the fact he had acquired 30 or more customers that by August 2012 Zekry had been trafficking in unstamped cigarettes for more than two months. (*Id.* ¶ 18).

3. "Traceable To"

Property that is purchased using proceeds of a CCTA violation constitutes property "traceable to" such proceeds and is thus forfeitable pursuant to 18 U.S.C. § 981(a)(1)(C). *See, e.g., United States v. 229 Potter Road*, 91 F. Supp. 3d 303, 307 (D. Conn. 2015); *United States v. 6557 Ascot Drive*, No. C 02-4948 (JSW), 2009 WL 857605 (N.D. Cal. Mar. 30, 2009). Therefore, if the accounts used to purchase the Properties contained the proceeds of Zekry's CCTA violation, the Properties are forfeitable. Based on the Government's allegations, it is reasonable to infer that both

accounts contained proceeds of Zekry's CCTA violation at the time the respective Properties were purchased.

The Government alleges the Jonathan 2100 Account was used to purchase the Eastwind Property in August 2012. (Compl. ¶ 32). Further, the Government alleges that "[a]n analysis of the Jonathan 2100 Account in the months leading up to the purchase of the . . . Eastwind Property show regular cash deposits and customer check deposits into the account." (*Id.*). The Government describes the customer checks as all being made out to "Cash" and some containing a reference line reading "cigarettes," "cigs," or "Mike." (*Id.* ¶ 28).

The Government alleges the Matatov 4937 Account[8] was used to purchase the Teriwood Property in September 2013. (Compl. ¶ 31). Further, the Government alleges that "for the first half of 2012, there was little activity in the [Matatov 4937 Account] except for biweekly deposits of $132, and the account balance never exceeded $500." (*Id.*). However, in August 2012 "approximately 29 customer checks [were] deposited into the account." (*Id.*). As noted previously, the Government describes the customer checks as all being made out to "Cash" and some containing a reference line reading "cigarettes," "cigs," or "Mike." (*Id.* ¶ 28). This "steady pattern of check deposits as well as cash deposits ranging from $1,000 to $7,000, continued on a monthly basis." (*Id.* ¶ 31).

In September 2013, the Matatov 4937 Account contained "approximately $109,000" of allegedly illegal proceeds. (Compl. ¶ 31). Even assuming the biweekly deposits of $132 of presumably "untainted" funds continued during this time, it is reasonable to infer the

---

[8] As noted previously, the Government's allegations refer to two different Matatov Accounts: (1) the Matatov 9453 Account and (2) the Matatov 4937 Account. *See supra* note 4. Whether this inconsistency is merely a typographical error or not, I treat the Matatov 4937 Account as the relevant account because it is the one specifically alleged to have been used to purchase the Teriwood Property. (Compl. ¶ 31). Moreover, on the allegations regarding the Matatov 4937 Account alone, it is reasonable to infer the Teriwood Property was purchased using proceeds of Zekry's CCTA violation.

approximately $95,000 used to purchase the Teriwood Property were exclusively the "tainted" proceeds of Zekry's CCTA violation.[9]

\* \* \*

As a whole, the Government's allegations combined with reasonable inferences drawn therefrom establish that both the Teriwood and Eastwind Properties were purchased with proceeds traceable to Zekry's CCTA violation. Therefore, the Properties are forfeitable under 18 U.S.C. § 981(a)(1)(C).

### B. Forfeitability of the Properties Pursuant to 18 U.S.C § 981(a)(1)(A)

Because the Properties are forfeitable under the Government's first theory, the Court need not reach the Government's second theory that the Properties are forfeitable under 18 U.S.C. § 981(a)(1)(A) because they were "involved in a transaction" in violation of the money laundering statutes. (Compl. ¶¶ 38, 44). Whether the Government would have succeeded on its second theory is in question given that the Government's allegations indicating the required intent to commit section 1956 money laundering are lacking. In fact, the Government's allegations, written primarily in the passive voice, make it difficult to decipher who conducted the relevant transactions to which the intent elements would apply. (*See* Compl. ¶ 27) (simply stating "the illegal proceeds were then used to purchase the Defendants *in rem*"); *see also Tymoshenko v. Firtash*, 57 F. Supp. 3d 311, 323 (finding the complaint failed "to adequately plead . . . money laundering" where it did not "identify who conducted the transfer" or that the individuals involved "acted with the intent required by 18 U.S.C. § 1956").

---

[9] In September 2013 when the Teriwood Property was purchased, the balance in the Matatov 4937 Account was approximately $109,000. (Compl. ¶ 31). Assuming the biweekly payments of $132 continued over the 13-month period between August 2012 and September 2013, the Account would contain only $13,728 of "untainted" funds. The Teriwood Property was obtained in an all cash purchase of approximately $95,000, leaving $14,000 in the Account. (*Id.*).

14

**CONCLUSION**

For the reasons set forth above, I respectfully recommend that the Government's Motion for Partial Default Judgment be granted and that the Court order the Teriwood and Eastwind Properties be forfeited to the Government. The Government is hereby directed to serve a copy of this Report and Recommendation upon all known potential claimants to the Defendants *in rem* by regular and certified mail and to file proof of service on CM/ECF. Any objections to the recommendations made in this Report must be filed with the Clerk of the Court and the Honorable Carol Bagley Amon within fourteen (14) days of receipt hereof. Failure to file timely objections waives the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).

RESPECTFULLY RECOMMENDED.

*Ramon E. Reyes, Jr.*

RAMON E. REYES, JR.
United States Magistrate Judge
Dated: May 18, 2020
         Brooklyn, NY